2024 IL App (1st) 230783-U

FIFTH DIVISION
April 5, 2024

No. 1-23-0783

NOTICE: This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| | | |
|---|---|---|
| KJ WIN, INC., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 21 L 006049 |
| | ) | |
| KNB MOTORS, INC., | ) | Honorable |
| | ) | Patrick J. Sherlock, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Justices Lyle and Navarro concurred in the judgment.

**ORDER**

¶ 1    *Held*:    (1) The trial court's finding in favor of plaintiff was not against the manifest weight of the evidence; (2) because the oral agreement for storage was separate from the written sales agreements, the parol evidence rule did not bar testimony about the storage agreement; and (3) the damages award in favor of plaintiff was not against the manifest weight of the evidence.

¶ 2    Plaintiff KJ Win, Inc. (KJ Win), is a California cargo shipment company that purchased a commercial truck from defendant KNB Motors, Inc. (KNB), an Illinois car dealership. Before KJ Win picked up the truck from KNB, KNB resold the truck to another customer. KJ Win sued KNB for breach of contract. After a bench trial, the trial court found in favor of KJ Win and awarded it

$20,129.12 in damages. On appeal, KNB argues that (1) the trial court rendered a judgment based on documents not admitted into evidence and improperly denied KNB's motion for a directed verdict, (2) the trial court erred by admitting testimony of an oral agreement, and (3) KJ Win failed to produce competent evidence of damages. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                  A. Pretrial Proceedings

¶ 5      In its verified amended complaint, KJ Win asserted claims for breach of contract and fraud against KNB. KJ Win alleged that on March 31, 2021, KJ Win and KNB executed a bill of sale for KNB to sell KJ Win a 2017 Volvo commercial truck. KJ Win paid the purchase price in full to KNB on or about the same day. The parties orally agreed that KJ Win would pick up the truck at least one month later. In later phone conversations, they agreed to "parking storage fees" of $20 per day and later $50 per day. When KJ Win attempted to pick up the truck from KNB's facility on or about May 18, 2021, KNB refused to deliver the truck because it had sold it to someone else. In its complaint, KJ Win sought specific performance of the contract, compensatory damages, and punitive damages.

¶ 6      KJ Win attached several documents to its complaint, including the bill of sale, an "as-is" rider, and a receipt and acknowledgment, all of which were signed by the buyer and the seller. The bill of sale, dated March 31, 2021, shows that KNB Motors sold the truck to KJ Win for $51,547.60. It provides that the "[p]urchaser agrees that this order includes all of the terms and conditions hereof, that this order cancels and supersedes any prior agreement written or oral." The "as-is" rider provides that "[n]o oral statements or representations shall be deemed evidence on any grounds unless reduced to writing and signed by the party to be charged." And the receipt and acknowledgment, dated March 31, 2021, provides that "[b]uyer acknowledges that no other oral

2

promises or representations have been made regarding this vehicle or the transaction other than those that have been reduced to a writing."

¶ 7 KNB Motors moved to dismiss the complaint pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2020)). On March 16, 2022, the trial court granted the motion in part, dismissing the fraud claim and the request for specific performance.

¶ 8 In its answer to KJ Win's complaint, KNB admitted that on or about March 31, 2021, the parties executed a bill of sale for the truck and that on or about the same day KJ Win paid the full price of $51,547.60 to KNB. KNB also admitted that representatives from KJ Win arrived to pick up the truck on or about May 18, 2021, but that KNB refused to deliver it, having already sold the truck to another party.

¶ 9                                                    A. Trial

¶ 10 KJ Win presented five witnesses—Zhogjie Zhang, who purchased the truck from KNB on behalf of KJ Win; Neo Lee, Mr. Zhang's friend who interpreted the communications with KNB for Mr. Zhang; and three KNB employees. KNB did not present any witnesses.

¶ 11                                          1. Zhogjie Zhang

¶ 12 Mr. Zhang testified through an interpreter that KJ Win was formed in January 2021 and that, in 2021, he was the CEO. Mr. Zhang negotiated the purchase of the 2017 Volvo commercial truck. Mr. Zhang used his friend to interpret his communications with KNB because his English was "not very good." The trial transcript identifies this friend as "Neil," but these appear to be references to Mr. Neo Lee.

¶ 13 Approximately three days before the day he signed the bill of sale, Mr. Zhang spoke with KNB over the phone. Mr. Zhang asked Mr. Lee "to also inform KNB that if [he] purchase[d] this truck or vehicle, [he] would only be able to pick it up after a month." Mr. Zhang said KNB Motors

agreed to "leave the truck for a month, then the truck w[ould] be picked up." Mr. Zhang explained that the reason for the delay was because KJ Win was a new company, getting the documents together would take time, and it would be more than a month before the truck could be on the road. Mr. Zhang was told that the storage would be free. Mr. Zhang could not recall the name of the person he spoke to at KNB.

¶ 14 Mr. Zhang paid the full amount for the truck on April 1, 2021. He received the title document for the truck in the mail and still possessed it at the time of trial. After receiving the title, Mr. Zhang next heard from KNB on April 15, 2021, when he was told that the storage fee would be $25 per day, and again on May 7, 2021, when he was told that the storage fee would be $50 per day. Through Mr. Lee, Mr. Zhang agreed to these amounts. No one at KNB ever told Mr. Zhang that if the truck was not picked up by a certain day it would be resold.

¶ 15 Mr. Zhang went to KNB's facility to pick up the truck on May 17, 2021, bringing all the necessary documents. He spoke with KNB employees named Eugene and Murphy. KNB did not permit Mr. Zhang to pick up the truck that day because KNB had already sold the truck to someone else.

¶ 16 KNB said it would refund KJ Win in a week. Instead, Mr. Zhang received a letter and a refund check in the mail in November 2021. The letter was dated June 21, 2021, and informed KJ Win that KNB was refunding it the amount of the sale, less a $750 restocking fee, $150 new-title fee, $595 prep fee, $303.60 dock fee, and a storage fee "of 950 per day for the dates of April 21 *** through May 8, [2021] and "600 and 150 per day for the dates of May 9 *** to May 13, 2021"—for a final refund total of $47,849. Mr. Zhang was unable to deposit the refund check because it "jumped or bumped," but received a wire from KNB Motors around November 17, 2021. Mr. Zhang said he did not agree to pay a storage fee of $100 per day from April 21 to May

8, 2021, and did not agree to pay a storage fee of $150 per day from May 9 to May 13, 2021.

¶ 17     Mr. Zhang testified about the expenses KJ Win incurred related to the breach of contract. These included: $2820.48 paid to IRP, Inc., a company that represented KJ Win in connection with its application to the department of transportation; $12 for a diesel tax; $200 for "a device for all trucks to pass through the inspections—the inspection station"; $20 "related to the truck going through inspections"; $7500 to "Evolution INS BK," which Mr. Zhang said was for the license plate and "a down payment" for insurance; $6.60 as a deduction from the device to "go through the inspection station"; $91.57 "for a document that would allow the trucks to pass through 48 states"; $1124.72 for the initial insurance payment; $714.90 as an insurance payment for the trailer; $15 for a truck location device; $592.61 at Pilot Gas for supporting items for the truck, such as the ties, the belts, and supporting parts; two charges of $178.40 for the airline tickets for Mr. Zhang and his friend who accompanied him from California to Chicago; a charge for an unspecified amount at Tony's Fresh Market which Mr. Zhang said was his breakfast; $8.98 for food at Popeye's; $22.49 for more food from Popeye's; $11.64 for food from McDonald's; $85.84 for a hotel; $18.74 for food at Burger King; and two charges for $356.40 each to American Airlines for their return flight tickets.

¶ 18     Mr. Zhang also identified several documents, including the California registration for the truck, a California insurance and identification card for the truck with an effective date of April 29, 2021, a certificate of liability insurance effective April 29, 2021, confirmation of insurance coverage with a policy effective date of April 29, 2021, and a statement from KJ Win's bank showing payments of $3421.56 were made on June 2, June 30, July 7, July 30, and August 4.

¶ 19     Mr. Zhang said he was unable to cancel the insurance policy after KNB refused to allow him to pick up the truck. He explained that if he canceled, the downpayment would not be

refunded. At the end of July or beginning of August 2021, he was able to transfer the policy to a truck KJ Win bought to replace the KNB truck. Mr. Zhang paid $3441.54 per month from April 28 until August 4, 2021, for the insurance.

¶ 20    Mr. Zhang testified that the company operated at a loss in 2021 because KNB did not deliver the truck. He estimated lost income from May 17 to November 17, 2021, was at least $50,000 per month.

¶ 21    Mr. Zhang offered some testimony on his search for comparable trucks. He said they were listed for $59,900 to $85,000. He was unable to testify about the repair history, the exact mileage, the speed range of the transmission, or the engine size of these other trucks.

¶ 22                                2. Neo Lee

¶ 23    Mr. Lee testified that he interpreted for Mr. Zhang in relation to the sale of the 2017 Volvo commercial truck. He and Mr. Zhang were friends. To the best of his knowledge, his interpretation relating to the transaction was accurate and complete. They first contacted KNB around March 27, 2021. Mr. Lee believed he spoke to someone named Eugene. He confirmed the price and condition of the truck and informed KNB, on behalf of Mr. Zhang, that they wanted to buy the truck but that they would "need to park right there around one month to two months." According to Mr. Lee, Eugene agreed and said parking the truck would be free.

¶ 24    On April 15, 2021, Eugene notified Mr. Lee that Mr. Zhang needed to pay $25 per day to store the truck. Mr. Lee contacted Eugene to relay that Mr. Zhang agreed to the charge and to bring Eugene up to date on the status of Mr. Zhang's applications. Eugene said that payment for storage would be due when Mr. Zhang picked up the truck. KNB called again on May 7, 2021, and said the storage fee would be $50 per day. Mr. Zhang agreed, and Mr. Lee again relayed this to KNB. On May 7, Mr. Lee also told KNB that "maybe in ten days we will pick up the truck." Mr. Lee

never received a phone call from KNB informing him that if Mr. Zhang did not pick up the truck by a certain date, KNB would sell it to someone else. Mr. Lee always contacted Mr. Zhang immediately whenever he received a call from KNB, and he gave KNB Mr. Zhang's response right away. Mr. Lee never received text messages from KNB about the truck.

¶ 25                                3. The KNB Employees

¶ 26                                a. Kadrije Abduli

¶ 27    Ms. Abduli worked in sales at KNB. She signed as the seller on the bill of sale, the disclosure statement, the "as-is" rider, and the receipt and acknowledgment. Ms. Abduli could not recall if she had a phone call with Mr. Zhang on March 31, 2021, or April 1, 2021, and she did not remember if Mr. Zhang ever said he would pick up the truck in at least one month. She was confronted with an August 2022 deposition in which she had said that she believed that Mr. Zhang said he would pick up the truck at a later time. She then said, "[S]ure whatever I ha[d] said in there was what I remembered on that day." Ms. Abduli testified that, "[a]fter the sale, I don't remember talking to them. These guys never picked up the phone. So I have left voicemails." She acknowledged that she never warned Mr. Zhang that the truck would be resold if he did not come get it. Ms. Abduli was not involved in the truck's resale.

¶ 28                                b. Eugene Fridlyand

¶ 29    Mr. Fridlyand was a sales manager at KNB and Ms. Abduli's supervisor. He did not recall Ms. Abduli telling him that KJ Win would pick up the truck at a later time. Mr. Fridlyand did not talk to KJ Win or Mr. Zhang about the truck before the sale.

¶ 30    Mr. Fridlyand said they "had some communication issues after the sale" and he "did speak to a couple of different people after the sale, but [he] d[idn't] remember who." Mr. Fridlyand remembered "there being a number of phone calls," maybe five to ten, and that "[i]t was very

7

difficult to get hold of them. And then we were getting bounced around as well as if those people just didn't want to talk to us. So it was strange." Mr. Fridlyand remembered the phone calls were about picking up the truck and said, "That's the only reason I got involved." He did not recall anyone at KJ Win explaining why they could not pick up the truck right away. He said that when they were able to get KJ Win on the phone, "they would inform us that they would get it right away, and then nothing." Mr. Fridlyand remembered speaking to "a minimum of two, maybe three" people at KJ Win. He said these calls occurred "a couple of weeks at least after the purchase because, like I said, we don't typically hold vehicles."

¶ 31    Mr. Fridlyand agreed that he told KJ Win he would charge storage fees "almost a month after the sale," but he could not recall the details beyond that he "explained to whoever I spoke with that there would be storage fees incurred and the vehicle really needs to get picked up." Mr. Fridlyand said, "It was my intention to explain to them what it would cost to keep the vehicle there any additional time." He "[v]ery much" wanted the vehicle removed and said he made that plain to KJ Win "[m]ultiple times." He said he would have told KJ Win that the storage fees would be due when they picked up the vehicle.

¶ 32    Mr. Fridlyand said he "probably eventually towards the end" would have sent text messages, mail, or voicemails saying that if KJ Win did not pick up the truck by a certain date, KNB would resell it to another customer, but he did not remember a particular date that he did so. He said that he probably left a voicemail.

¶ 33    As part of KJ Win's effort to prove damages, Mr. Fridlyand was shown Plaintiff's Exhibit 8, a bill of sale for the truck that was signed by someone named "Max" as the buyer and dated May 13, 2021. Mr. Fridlyand agreed that the dollar amount on the bill of sale was $57,837.60. Mr. Fridlyand said, however, "I don't even know if that's who bought the car," and pointed out that

8

there was no signature from the seller. Mr. Fridlyand said he "didn't have any particular recollection of who it was sold to."

¶ 34    Mr. Fridlyand viewed the refund letter dated June 21, 2021, and said he had prepared it. In the letter, which was addressed to KJ Win, he said that KNB was refunding $47,849. He gave the same testimony that Mr. Zhang did about the deductions from the sales price to reach the refund amount.

¶ 35                              c. Nikolai Kitsutkin

¶ 36    Mr. Kitsutkin was the general manager of KNB. He testified that he had never contacted KJ Win "in any way."

¶ 37    Mr. Kitsutkin made the decision to resell the truck with Mr. Fridlyand, but he did not remember when. Mr. Kitsutkin was "pretty sure" someone at KNB told KJ Win that if the truck was not picked up it would be resold to another customer. Mr. Kitsutkin said, "In this case, it was extremely hard to get in touch with the buyer. So it was relayed to them verbally over the phone as there were no response to either email or text messages." KNB did not have a policy about vehicle storage; KNB was "not a storage facility."

¶ 38               3. Closing Argument, Judgment, and the Motion to Reconsider

¶ 39    In closing, counsel for KNB said, "By way of housekeeping, first, we note that [KJ Win] failed to move any documents into evidence," and that "[t]here [wa]s nothing before the Court to consider in light of any documentary testimony." He then argued that there was no breach of contract.

¶ 40    After hearing argument from both sides, the trial court said:

        "So it's clear to me that the Plaintiff should be successful on its claim for breach of
        contract. The Plaintiff paid the money. The Defendant sent the title. The Defendant then,

9

for whatever reason, got sick of waiting for the Plaintiff to pick up the vehicle, and maybe rightfully so. It doesn't really matter. It was the Plaintiff's truck. And if the Defendant didn't think it belonged on their property, the appropriate action for the Defendant to have taken was to have it removed from their property, not to sell it [to] someone else."

¶ 41    As to damages, the court first said it "believe[d] [KJ Win] when they said that they were told that they would be charged $25 and then $50 a day, and they agreed to those fees." The court thus found that KNB wrongfully deducted $2648.60 from the refund. The court also awarded KJ Win $1253.69 in interest on the cost of the truck from May 17, 2021, to when KJ Win actually received the refund six months later. The court awarded KJ Win "the fair market value of the truck as it stood at the time of purchase," which the court based on "the offer made by Max"—$6290 more than KJ Win had agreed to pay. The court did not find "the so-called comps that [KJ Win] tendered were sufficient to carry the day" because Mr. Zhang "couldn't testify as to any of the particulars of the comps" such as accessories and engine size. The court also said it "believe[d] that [KNB Motors] had sold the truck well before [KJ Win] flew to Illinois to pick it up," and thus awarded KJ Win the cost of the flights to and from Illinois—$356.80 to Illinois and $706.40 home. The court also awarded KJ Win two months of insurance payments in the amount of $6083.15 and $2820.48 for the truck registration. In total, the court awarded KJ Win $20,159.12 in damages. The court noted that it had considered KJ Win's claim for lost profits but concluded they were "too speculative."

¶ 42    On February 21, 2023, KNB filed a motion to reconsider. In it, KNB challenged the court's finding of damages, again pointing out that KJ Win failed to move the supporting documents into evidence. KNB also argued that the bill of sale was "the full agreement of the parties and makes no mention of any agreements for storage. Treating the oral agreement for storage as a separate

non-integral contract is directly contradicted by the testimony." In conclusion, KNB "move[d] for a directed verdict of non-suit in that there [wa]s no lawfully admitted evidence before the court to support its verdict and judgment" and, in the alternative, for judgment entered in favor of KNB.

¶ 43    The court denied KNB's motion to reconsider on April 4, 2023. This appeal followed.

¶ 44                                II. JURISDICTION

¶ 45    The trial court denied the motion to reconsider on April 4, 2023, and KNB Motors timely filed a notice of appeal on May 2, 2023. We have jurisdiction over this appeal pursuant to Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017), governing appeals from final judgments entered by the circuit court in civil cases.

¶ 46                                III. ANALYSIS

¶ 47    On appeal, KNB argues that (1) the trial court rendered a judgment based on documents not admitted into evidence and improperly denied KNB's motion for a directed verdict, (2) the trial court erred by admitting testimony of an oral agreement, and (3) KJ Win failed to produce competent evidence of damages. We consider each issue in turn.

¶ 48              A. The Trial Court Did Not Err by Finding in Favor of KJ Win

¶ 49    KNB first argues that the trial court erred in denying its motion for a "directed verdict." Technically, because this was a bench trial rather than a jury trial, the motion would have been for a directed finding or judgment. 735 ILCS 5/2-1110 (West 2022). Either way, the record makes clear that KNB never moved for a directed verdict or finding.

¶ 50    Section 2-1110 of the Code (735 ILCS 5/2-1110 (West 2022)) provides that "[i]n all cases tried without a jury, defendant may, at the close of plaintiff's case, move for a finding or judgment in his or her favor." The time for KNB to move for a directed finding was at the close of KJ Win's evidence. Instead, KNB rested. Closing argument was the first time that KNB pointed out that KJ

11

Win had failed to enter documents into evidence. The first time that KNB requested a "directed verdict" was in its motion to reconsider. However, as we have already noted, that was simply not the appropriate time to ask for such relief. The court did not err by failing to rule on a motion that was never timely made.

¶ 51    To the extent KNB is arguing on appeal that the trial court erred in finding in favor of KJ Win because that finding was based only on documents not in evidence, we are similarly unpersuaded. "When, as in this case, a party challenges the sufficiency of the evidence to support a judgment following a bench trial, our standard of review is whether the trial court's judgment is against the manifest weight of the evidence." *Kroot v. Chan*, 2017 IL App (1st) 162315, ¶ 19. Under this standard, "[a] reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses, the weight to be given the evidence, or the inferences to be drawn," and the trial court's judgment will be reversed "only if the opposite conclusion is clearly evident or if the finding itself is unreasonable, arbitrary, or not based on the evidence presented." *Offord v. Fitness International, LLC*, 2015 IL App (1st) 150879, ¶ 16.

¶ 52    While KJ Win never moved to have its documentary evidence admitted at trial, the documents on which KJ Win's breach of contract claim were primarily based—the sales agreements for the truck, including the bill of sale, as-is rider, and receipt and acknowledgment— were properly before the court because they were a part of the complaint.

¶ 53    "It is generally true that a document must be offered by its proponent and admitted into evidence by the trial court before it may be considered as evidence." *Jill Knowles Enterprises, Inc. v. Dunkin*, 2017 IL App (2d) 160811, ¶ 21. However, section 2-606 of the Code specifically requires that "[i]f a claim or defense is founded upon a written instrument, a copy thereof *** must be attached to the pleading as an exhibit." 735 ILCS 5/2-606 (West 2022). The written instrument

then "constitutes part of the pleading for all purposes and need not be introduced into evidence to be considered." *Jill Knowles*, 2017 IL App (2d) 160811, ¶ 26. Although *Jill Knowles* is a small claims case, our supreme court said substantially the same in *Peters v. Peters*, 376 Ill. 237, 240-41 (1941), a probate case:

> "It is unnecessary to introduce evidence to prove facts admitted by the pleadings. [Citations.] In this case, the complaint having alleged in general terms the contents of the will, and so described it as to afford positive identification, alleged its probate, and attached a copy thereof to the complaint, all of which allegations were admitted by the answer, it was not necessary to make proof of the instrument by offering it in evidence."

¶ 54    Here, not only were the sales agreements between KJ Win and KNB attached as an exhibit to KJ Win's amended complaint, but KNB admitted in its answer that the parties had executed the bill of sale and that KJ Win had paid the full price for the truck. Accordingly, the court could properly consider the sales agreements when rendering its finding. See *Jill Knowles*, 2017 IL App (2d) 160811, ¶ 26 (finding that certain documents were properly considered under section 2-606 despite not being entered into evidence, in part because the defendant admitted in her answer the existence of those documents).

¶ 55    Even if the remaining documentary exhibits were not properly before the trial court, its finding in favor of KJ Win was not against the manifest weight of the evidence. The sales agreement was part of the complaint and admitted to in the answer, and all witnesses agreed that KJ Win paid the full purchase price of the truck to KNB and that the truck was sold to someone else. Accordingly, the trial court did not err in finding for KJ Win on the breach of contract claim.

¶ 56       B. The Trial Court Properly Relied on the Parties' Oral Storage Agreement

¶ 57    KNB next argues that the trial court erred by considering testimony concerning an oral

agreement as to storage. The bill of sale provided that the "[p]urchaser agree[d] that *** this order cancel[ed] and supersede[d] any prior agreement written or oral"; the as-is rider included a provision that "[n]o oral statements or representations shall be deemed evidence on any grounds unless reduced to writing and signed by the party to be charged"; and the receipt and acknowledgment stated that the "Buyer acknowledge[d] that no other oral promises or representations have been made regarding this vehicle or the transaction other than those that have been reduced to a writing." Based on these provisions, KNB argues that the oral agreement for storage was prohibited by the terms of the written contract.

¶ 58    In support, KNB relies on the parol evidence rule, which "generally precludes evidence of understandings not reflected in the contract, reached before or at the time of execution which would vary or modify it[s] terms." (Internal quotation marks omitted.) *First Health Group Corp. v. Ruddick*, 393 Ill. App. 3d 40, 53 (2009). But the oral agreement for storage did not in any way modify or vary the terms of the sales agreements. Rather, it was a separate agreement. Neither the bill of sale, the as-is rider, nor the receipt and acknowledgment contain any provision at all about storage. Nor did anything in those agreements indicate that the truck had to be picked up at a certain time. Because storage was not contemplated by those agreements, any storage agreement was necessarily a separate matter.

¶ 59    Under these circumstances, the trial court did not err in finding that the oral storage agreement was valid.

¶ 60             C. The Trial Court's Award of Damages Was Not Erroneous

¶ 61    Finally, KNB argues that the award of damages was in error because KJ Win "failed to produce any competent evidence of damages." "An award of damages will not be overturned unless it is against the manifest weight of the evidence." *Racky v. Belfor USA Group, Inc.*, 2017

IL App (1st) 153446, ¶ 127. "A judgment is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the findings are unreasonable, arbitrary, and not based upon any of the evidence." *Id.*

¶ 62 Although KNB again points to KJ Win's failure to move its documents into evidence, there was ample testimony to support the trial court's award of damages. Mr. Zhang testified about the money he spent in anticipation of receiving the truck. Mr. Fridlyand testified about the bill of sale filled out by "Max," dated May 13, 2021, and the fact that the price on that bill of sale was $57,837.60. And both Mr. Zhang and Mr. Fridlyand both testified about the refund, the refund letter, and the deductions KNB took from the sale price of the truck. The only evidence contradicting the testimony on the oral agreement was the refund letter that reflected far higher storage fees, but the court made clear that it believed KJ Win that the parties had agreed to the lower prices. Based on the testimony at trial, the trial court's award of damages was not against the manifest weight of the evidence.

¶ 63                                IV. CONCLUSION

¶ 64 For the foregoing reasons, we affirm the judgment of the trial court.

¶ 65 Affirmed.